IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 - CR-927 |
| | ) | Hon. Amy J. St. Eve |
| | ) | |
| v. | ) | |
| | ) | |
| ERIK SHAMSUD-DIN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY
AND REQUEST IN THE ALTERNATIVE FOR *DAUBERT* HEARING**

Defendant Eric Shamsud-din, by his attorneys respectfully requests that this Court enter an Order *in limine* barring Dr. Sharon Cooper's testimony. In the alternative, Mr. Shamsud-din respectfully requests that the Court conduct a hearing under *Daubert v. Merrell Dow Pharmaceutials, Inc.,* 509 U.S. 579 (1993) to allow Mr. Shamsud-din to, *inter alia*, take testimony from Dr. Cooper about her background and proposed testimony to provide a fuller record for the Court to consider in determining the admissibility of her testimony. Finally, Mr. Shamsud-din objects to the government's disclosure of Dr. Cooper as inadequate because it fails to disclose the opinions that Dr. Cooper plans to offer.

## Introduction

Dr. Cooper will not testify with respect to any of the events of this case. The government has informed Mr. Shamsud-din that it does "not intend to elicit

1

testimony from Dr. Cooper about the specific facts of or victims in this case." *See* October 14, 2011 Letter from Margaret Schneider, attached hereto as Exhibit A. Instead, the government intends to elicit expert testimony from Dr. Cooper on the following topics:

> The government expects that Dr. Cooper will be qualified to testify as an expert on common dynamics that occur in the operation of sex trafficking, including: (1) the typical means sex traffickers use to target, recruit, manipulate, and maintain adult and minor victims; (2) contributing factors that can make adult and minor victims more susceptible to influence by sex traffickers; (3) common means that sex traffickers use to maintain control over the victims' actions and to prevent victims from leaving the relationship; and (4) other information about the subculture of sex trafficking, including the meaning of certain terms such as 'bottom b**tch,' 'out of pocket,' 'daddy', and the 'track.'

*Id* at p. 1.

While the foregoing statement does not provide a summary of Dr. Cooper's opinions, a review of prior testimony and court opinions provided by the government makes clear that her testimony and its use by the government likely will proceed as follows: (1) sex traffickers in Dr. Cooper's view generally tend to use certain methods to recruit, manipulate and control their victims; (2) victims of sex trafficking in Dr. Cooper's view generally tend to have certain vulnerabilities that make them susceptible to traffickers (such as low self esteem) and to exhibit certain mental or emotional disorders or conditions after having been trafficked (such as a tendency to blame themselves); and (3) the government's evidence and narrative are correct because they are consistent with Dr. Cooper's views and the defense evidence and narrative are incorrect because they are inconsistent with Dr. Cooper's

2

views (thus, for instance, statements by Victim A that she engaged in prostitution of her own free will and admissions by Victim B that she had been a prostitute for years before ever encountering Mr. Shamsud-din are to be discounted because such statements are a form of self blame rather than an honest account of past events).

Expert testimony that purports to identify and describe "typical" behaviors or conditions of certain types of persons for purposes of trying to establish what really happened in a case warrants intense scrutiny. For such testimony even to be considered for admission, it ought, at a minimum, to be based on substantial research that is conducted by persons trained and licensed in the appropriate professions (such as psychiatry or psychology), that considers statistically significant, carefully identified and collected data sets, is subject to controls for bias, is statistically analyzed and then is subject to rigorous peer review and is the subject of debate. How else could ostensibly "typical" behaviors of members of a large population be identified with any confidence, scientific or otherwise?

A review of Dr. Cooper's background and the bases of her testimony reveals that she offers nothing even remotely resembling this sort of foundation for her opinions. As explained below, Dr. Cooper is a pediatrician who is offering opinions that are primarily not of a medical nature (dealing instead with human behavior and mental condition) based upon her review of literature prepared by others, her interaction with others who deal with sex trafficking cases (such as law enforcement officers) and her interaction (the nature of which is undefined) with "well over" 200 former child prostitutes and with very few sex traffickers. From what Mr.

3

Shamsud-din can tell Dr. Cooper never has conducted any sort of empirical, controlled study of either victims of sex trafficking or sex traffickers where a statistically significant sample was collected by a consistent methodology, bias (including her own) was controlled and the data was subjected to statistical analysis. Indeed, it is not clear that Dr. Cooper ever has systematically collected and studied data from sex trafficking victims in any way, valid or invalid. Rather, she is simply offering her impressions based upon what she has read, what other professionals have told her and her encounters (of a nature undefined) with a statistically insignificant sample of sex trafficking victims and a miniscule number of sex traffickers. This is not "expertise" of the sort that will help the trier of fact but rather precisely the sort of pseudo "science" that *Daubert* and its progeny teach should not be allowed into evidence.

## Argument

The Seventh Circuit has set forth the standards governing the admission of expert testimony as follows:

> Federal Rule of Evidence 702 governs the admissibility of expert testimony, as does the Supreme Court's seminal case of *Daubert v. Merrell Dow Pharmaceutials, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Rule 702 by its terms allows the admission of testimony by an 'expert,' someone with the appropriate 'knowledge, skill, experience, training, or education' to help the trier of fact 'understand the evidence or determine a fact in issue.' Fed. R. Evid. 702. Experts are only permitted to testify, however, when their testimony is (1) 'based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.' *Id. Daubert* requires the district court to act as an evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony

of a proffered expert. *See Daubert,* 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Jenkins v. Bartlett,* 487 F.3d 482, 488-89 (7th Cir. 2007). We give district courts wide latitude to make their evidentiary determinations: we review whether they applied the *Daubert* framework de novo, but we review their ultimate conclusions as to the admissibility of expert testimony only for abuse of discretion. *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009).

*United States v. Lupton*, 620 F.3d 790, 798-99 (7th Cir. 2010). Here, Mr. Shamsud-din respectfully submits that (1) Dr. Cooper's proposed testimony does not satisfy Rule 702 and *Daubert*, (2) should be barred under Rules 402 and 403 and (3) decisions of other federal courts that have qualified Dr. Cooper as an expert on the subject matter at bar and admitted her testimony either are distinguishable or wrongly decided and therefore entitled to no weight in this Court. In the alternative, in the event that the Court declines to exclude Dr. Cooper's testimony, Mr. Shamsud-din respectfully requests that the Court conduct a hearing under *Daubert v. Merrell Dow Pharmaceutials, Inc.,* 509 U.S. 579 (1993) to allow Mr. Shamsud-din to, *inter alia*, take testimony from Dr. Cooper about her background, proposed testimony and the bases therefor to provide a fuller record for the Court to consider in determining the admissibility of her testimony. Finally, Mr. Shamsud-din objects to the government's disclosure of Dr. Cooper as inadequate because it fails to disclose the opinions that Dr. Cooper plans to offer.

I. Dr. Cooper's Testimony Does Not Satisfy Rule 702 Or *Daubert*

Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

5

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if"

> (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-49 (1999), "[t]he district court … must act as the gatekeeper to ensure that the proffered testimony is both relevant and reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Mr. Shamsud-din respectfully submits that Dr. Cooper's proposed testimony does not meet the requirements of Rule 702 or *Daubert*.

<u>*Expert Qualifications*</u>. Mr. Shamsud-din respectfully submits that Dr. Cooper's testimony should be barred because she lacks sufficient expertise to testify as an expert on the topics proposed by the government. *See, e.g., E360 Insight, Inc. v. Spamhaus Project*, 2011 U.S.App.LEXIS 18322 at *23 (7th Cir. September 2, 2011)("…Federal Rule of Evidence 702 … allows only *qualified* experts to testify regarding scientific, technical or other specialized knowledge.")(emphasis added).

First, a significant portion of Dr. Cooper's testimony concerns sex trafficking of "adult victims." *See, e.g.,* October 14, 2011 Letter from Margaret J. Schneider, Ex. A, p. 1 (Among the topics of Dr. Cooper's testimony is "the typical means sex

6

traffickers use to target, recruit, manipulate, and maintain *adult* and minor victims") (emphasis added). Dr. Cooper is a pediatrician whose focus has been child sexual abuse and exploitation. *See, e.g.,* Dr. Cooper *Curriculum Vita*, attached hereto as Exhibit B. Nothing in Dr. Cooper's background indicates that she has studied adult victims of sex trafficking. *Id.* Mr. Shamsud-din respectfully submits that Dr. Cooper lacks sufficient knowledge and qualifications to offer expert opinions regarding "adult victims" of sex trafficking.

Second, Mr. Shamsud-din respectfully submits that Dr. Cooper also lacks the qualifications to testify as an expert on the remaining topics proposed by the government, which concern the "minor victims" of sex traffickers, the means used by sex traffickers to "control" victims and "other information about the subculture of sex trafficking." *See, e.g.,* October 14, 2011 Letter from Margaret J. Schneider, p. 1.

Earlier this year Dr. Cooper testified that her "primar[y]" qualification to testify as an expert "in the area of child sexual exploitation and pimp/prostitute dynamics" is "from reading in the literature." *See United States v. Bogan*, CR 10-505-PHX-NVW (D. Ariz. March 30, 2011), attached hereto as Exhibit C, p. 20.[1] She also claimed to derive expertise from her interaction with others in the field (such as law enforcement personnel and various researchers), her encounters with "well over" 200 children who have been prostitutes in the past and her editing of a text

---

[1] Dr. Cooper's testimony in *Bogan* was the most recent instance in which she testified as to her qualifications as an expert from among the materials provided by the government. Mr. Shamsud-din attaches hereto as Exhibit C the government's initial examination of Dr. Cooper during a *Daubert* hearing in *Bogan*.

book on child sexual exploitation and authoring of some chapters therein. *Id* at pp. 20-26. In addition, Dr. Cooper also has interviewed "[d]efinitely less than 10" pimps and has reviewed the testimony of some pimps. Id at pp. 34, 37. Finally, Dr. Cooper claims to have sufficient expertise to opine on human behaviors, emotional disorders and similar topics -- subject matters that fall within the realm of psychiatry or psychology rather than pediatric medicine -- because "almost all health care providers have to have an understanding of mental health problems." *Id* at p. 28.

Mr. Shamsud-din respectfully submits that the foregoing is insufficient to qualify Dr. Cooper as an expert in minor sex trafficking or at least to qualify her as an expert to offer the opinions that she proposes to provide here. Dr. Cooper has very little experience with sex traffickers and her only firsthand experience with the victims of sex trafficking is her undefined interaction with "well over" 200 former child prostitutes. It does not appear that she ever has studied a statistically significant sample of sex trafficking victims (or sex traffickers) in any controlled way (or any other way) where biases (whether her own biases as a researcher and interviewer or biases of the victims, such as recall bias) was controlled, where a consistent methodology (or any methodology) of gathering data was applied, where her raw data was preserved for analysis by other researchers, where her data was statistically analyzed and where her methodology and results were subjected to peer review. Indeed, it does not appear that Dr. Cooper even studied the "well over" 200 victims that she encountered in any systematic way,

followed them over time or otherwise conducted anything like the sort of controlled research that would allow her to offer the sort of very general, behavioral opinions that the government seeks to elicit here.[2] And this is without even taking into account the fact that she has studied sex traffickers little if at all, which also leaves a significant gap in her inquiry into this area.

More fundamentally, beyond the absence of any research by Dr. Cooper to support her opinions, all or most of her proposed testimony involves matters of human behavior and mental health that are outside the field of pediatric medicine, and within fields such as psychiatry and psychology, in which she is neither trained nor licensed. Dr. Cooper's claim that "all health care providers have to have an understanding of mental health problems," the rationale she offered in the recent *Bogan* case for why she was qualified to stray well outside pediatrics, is wholly insufficient. This may explain why Dr. Cooper learned something about mental health, but it offers no explanation as to how much she learned or why she should be considered an expert in mental health or any field of behavioral science.

---

[2] It is certainly true that Dr. Cooper edited and wrote several chapters of a text book on child exploitation, which she has testified was peer reviewed, and her *curriculum vita* lists other publications (apparently also peer reviewed) and numerous presentations (*see* Cooper *Curriculum Vita*, attached hereto as Exhibit B), but Mr. Shamsud-din could find no evidence of actual research she conducted with respect to sex trafficking victims or sex traffickers. She certainly offered no such research when setting forth her qualifications in *Bogan*, *supra*. And as for Dr. Cooper's text book, while Mr. Shamsud-din has not yet been able to review a copy thereof, the book does not seem to offer research by Dr. Cooper about sex trafficking victims or sex traffickers. Dr. Cooper did testify in *Bogan* about a study carried out by a co-author, Dr. Estes, but she did not conduct that study and the study in any event appears to concern the incidence of child prostitution, not (or at least not as discussed in Dr. Cooper's testimony) the behavior of sex traffickers or their victims. *Bogan*, Ex. C, pp. 32-34.

Dr. Cooper simply does not have the background, training or licensing to offer the opinions the government intends to elicit, which are well beyond her field of pediatric (or forensic pediatric) medicine. *See Deimer v. Cincinnati Sub-Zero Products, Inc.,* 58 F.3d 341, 345 (7th Cir. 1995) (physician is not qualified to testify on matters beyond his "requisite experience").

*Assist The Trier Of Fact*. Dr. Cooper's testimony will not assist the trier of fact. She apparently has not interviewed either Victim A or Victim B or otherwise studied the facts of this case. She will offer no testimony about the facts of this case. One purpose for which the government proposes to offer Dr. Cooper's testimony is to explain the "meaning of certain terms such as 'bottom b**tch,' 'out of pocket,' 'daddy', and the 'track,'" *see* Schneider Letter, Exhibit A, p.1, but the government can ask its witnesses what they mean when they use such terms and the jury then can assess their credibility. And most significant of all, as explained *supra* and *infra*, Dr. Cooper is offering impressions, not considered opinions, based upon her interaction with a tiny sample of former child prostitutes, her reading and her discussions with others rather than upon anything like proper empirical research.

*Sufficient Facts Or Data*. As explained *supra*, Dr. Cooper's only firsthand experience with victims of sex trafficking is her interaction with "well over" 200 former child prostitutes. This is nothing like the sufficient facts or data that Rule 702 requires to support the very general opinions that the government proposes to elicit here about the behavior of sex traffickers or their victims. To begin, this data

set plainly is not a statistically significant sample of those who have been sex trafficked. *See, e.g.,* Janet Kornblum, "Child Prostitution Survivor Aims To Change Lives," USA Today, February 27, 2008 (noting that some estimates of the incidence of child prostitution in the United States range from 100,000 to 300,000 children but that there is a lack of reliable estimates). And it is not even clear – indeed, it is highly unlikely, see *infra* – that Dr. Cooper ever collected information from these victims in any consistent, methodological way, if she ever collected data from any or all of them.[3] When recently setting forth her qualifications, Dr. Cooper certainly testified to no such valuable data set that she has compiled. *See Bogan*, Exhibit C, *passim*. In short, what Dr. Cooper seems to possess is anecdotal information drawn from her work in this field. That is not "facts" or "data" within the meaning of Rule 702; it is story telling. *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996) (affirming the exclusion of a doctor's opinion on the grounds that it was a mere "hunch" and "lack[ed] scientific rigor").

<u>Reliable Principles And Methods</u>. Dr. Cooper does not appear to have come by her opinions by the application of any principles or methods of any type. In her testimony in *Bogan*, she never explained exactly how she interacted with the "well over" 200 former child prostitutes that she encountered. Was she their treating physician? Did she interview them as part of her work as an expert witness? Or, as seems to be the case from reading the attached testimony in *Bogan* as a whole,

---

[3] Contrast this with the interview that Dr. Cooper conducted with the victim in *Bogan*, which involved an apparently extensive protocol. *See, e.g.,* Bogan, Exhibit C, pp. 71-75 (describing various types of interviews)

11

did she encounter them in all kinds of different contexts – including as a treating physician, an expert witness, as the editor of a text book to which former child prostitutes contributed writings, at conferences, *etc.* – and employed no consistent method of gathering information from them, perhaps did not gather information from a number of them and in any event never read other materials about them (such as testimony under cross examination) to validate what they told her? Dr. Cooper described her "methodology … [for] … understanding and gathering information on the structure of pimping as follows:

> The methodology that I use in understanding and gathering information on the culture of pimping is based upon my knowledge of the literature of which there is a significant amount now: My interacting with agents who work within this area on a regular basis, typically at NCMEC; my working with federal investigators, typically. Usually they are federal investigators or state bureau investigators of specific offenders; and my reviewing testimony of offenders who have usually turned evidence so to speak in a given case.

*Bogan*, Ex. C, p 34. Dr. Cooper also claimed to have learned information from interviews of child prostitutes. *Id*, p. 35; *see also* pp. 35-36 (further describing methodology).

All Dr. Cooper offered in her testimony in *Bogan*, described *supra*, was a historical account of the various ways that she gathers information. She did not describe any methodology. And for the best of reasons: she has no methodology. A district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. *Daubert* instructed consideration of the following factors in this regard: "(1) whether the theory has been tested; (2) whether the theory has been subjected to

peer review and publication; (3) the known or potential rate of error; and (4) whether it has been generally accepted within the relevant scientific community. *Id.* at 593-94. Dr. Cooper's testimony satisfies none of these criteria and is not reliable under *Daubert*. Dr. Cooper offers no theory or methodology, much less a theory or methodology that can be tested or peer reviewed by anyone else. It is impossible to duplicate her work and test for a potential error rate. And it is unclear whether the opinions Dr. Cooper offers here ever have been accepted by the medical community; it certainly seems that they are not the subject of any research she ever has published.

*Application To This Case; Relevance*. Dr. Cooper will not testify about the persons or events at issue here; she has not applied any principals to the facts of this case. Nor does her work provide her with anything like a sufficient basis to opine on the general behaviors of sex traffickers or their victims. *See supra*. Accordingly, her testimony has no application whatsoever to this case and is irrelevant thereto.

In sum, Dr. Cooper's proposed testimony should be stopped at the threshold. Dr. Cooper is a pediatrician testifying primarily about human behavior and mental and emotional conditions despite having no training in the fields that address such matters (psychiatry, psychology, etc.), having no methodology by which she has reached her conclusions and having no data in any event to analyze. It is no answer to say that these criticisms go to the weight of her testimony rather than

its admissibility. The whole point of *Daubert* and its progeny was to stop such pseudo science at the courtroom door before terrible damage (*see infra*) is done.

II. Dr. Cooper's Testimony Should Be Barred Under Rules 402, 403

As explained *supra*, Dr. Cooper's testimony – which does not concern the persons or events at issue and offers general opinions about sex trafficking that are the product of neither expertise nor of reliable methodology or data and thus are invalid – makes no fact of consequence to the determination of this action any more or less likely and therefore should be excluded under Rule 402. Moreover, any marginal relevance of Dr. Cooper' testimony "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,' Fed. R. Evid. 403, and therefore Dr. Cooper's testimony should not be admitted. Dr. Cooper's testimony will be monumentally unfair to Mr. Shamsud-din by allowing the government essentially to present its closing arguments about witness credibility and what the evidence otherwise shoes before the jury in the guise of expert testimony. Such testimony also will confuse and mislead the jury, which likely will accord improper weight to Dr. Cooper's testimony due to her "expert" status.

III. Federal Decisions Admitting Dr. Cooper's Testimony Deserve No Weight

The government has provided Mr. Shamsud-din with copies of decisions from other federal courts admitting Dr. Cooper's testimony. *See, e.g., United States v. Mujahid*, 09-CR-00053 (D. Alaska August 23, 2011); *United States v. King*, 703 F.Supp.2d 1063 (D. Hawaii 2010). Mr. Shamsud-din respectfully submits that these

decisions are entitled to little weight. Neither of these decisions, for instance, seems to consider in any meaningful way, that Dr. Cooper is opining about alleged standard behaviors of members of a large population despite never having studied a statistically significant sample of that population in any way, much less in a controlled, valid way. Nor does either decision seem to come to grips with the fact that Dr. Cooper has strayed well outside the field of pediatrics and is testifying about behavioral and mental health matters as to which she is not an expert.

IV. In The Alternative This Court Should Hold A *Daubert* Hearing

If the Court is not inclined to grant this Motion as an initial matter, then Mr. Shamsud-din respectfully requests an evidentiary hearing under *Daubert* during which he can cross examine Dr. Cooper about her qualifications, methodology, data and other matters and thereby demonstrate that her testimony should not be admitted.

V. The Government's Disclosure Is Inadequate

"At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G). Mr. Shamsud-din respectfully submits that the government has not provided a written summary of Dr. Cooper's proposed testimony but rather provided only a list of very general topics that she will address. *See* Schneider Letter, Exhibit A, p. 1. Mr. Shamsud-din respectfully requests that the Court order the government to provide a written summary of the

15

specific opinions that the government plans to elicit from Dr. Cooper well in advance of trial and well in advance of any *Daubert* hearing. Mr. Shamsud-din especially needs the summary here because Dr. Cooper is a prolific expert witness and conference participant (*see* Cooper *Curriculum Vita* attached hereto as Exhibit A) and in order to prepare Mr. Shamsud-din respectfully submits that he needs a much more specific statement of Dr. Cooper's proposed testimony in order to know the specific areas to focus upon from amongst her vast history as a witness.

Date: October 26, 2011.  By: /sTimothy P. O'Connor
  One of His Attorneys


John A. Meyer
Timothy P. O'Connor
MEYER & O'CONNOR, LLC
Suite 3300
135 S. Clark Street
Chicago IL 60603
(312)-346-9000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby states that he caused a copy of the foregoing DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY AND REQUEST IN THE ALTERNATIVE FOR *DAUBERT* HEARING to be served upon

> Margaret J. Schneider
> Heather K. McShain
> Assistant United States Attorneys
> 219 S. Dearborn
> Chicago IL 60604

by electronic service through the Court's ECF filing system on this 26th day of October, 2011.

s/Timothy P. O'Connor